The 4th District Appellate Court of the State of Illinois has reconvened. The Honorable Peter C. Kavanaugh presiding. Thank you. Good afternoon. We'll next call 4-24-0050. Lori Plecki, executor of the State of Joseph Plecki. Versus Michael Treanor, MD, Illinois Institute et al. First, if counsel for the appellant, if you please state your name for the record. Thank you, Judge. Matthew Ports, P-O-R-T-S, for appellant. Thank you for the appellee. Chris Drinkwine, Your Honor, for Methodist Medical Center of Illinois. Thank you, Mr. Ports. You may proceed. Thank you, Your Honor. If it pleases the court, Counsel, my name is Matthew Ports on behalf of the plaintiff appellant. When the trial court denied plaintiff's motion to compel written discovery on appellant authority, then compounded it by preventing plaintiff from taking oral discovery on the same subject, it barred all discovery on a properly pled claim in plaintiff's complaint. Illinois Supreme Court Rule 201 allows the party to obtain by discovery full disclosure regarding any matter relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking disclosure or of any other party. Plaintiff made a claim of apparent authority in its third amended complaint. The trial court barred plaintiff from obtaining evidence on that issue, which was properly pled and which the plaintiff has the burden to prove. Denying plaintiff's motion to compel and then striking plaintiff's notice of deposition of Methodist, a person most knowledgeable in marketing of the hospital, so as to explore how Methodist holds itself out, a deposition that was properly noticed and during a time when other Rule 213, F1 and F2 depositions were taking place, made it impossible for the plaintiff to explore the issue of apparent authority. Good afternoon. Wasn't plaintiff's motion to compel production of these marketing materials not untimely when it came nine months after the objection was made? It was not untimely. There is no case law that suggests there is a bright line rule. There is no statutory law that suggests there's a bright line rule. Discovery is open. It is still open today. Written discovery is open today. Oral discovery is open today. Generally speaking, in practice, while discovery is open, all issues are on the table. I don't have experience otherwise. The only case that touches on this is the Favia case. The Favia case was four months there, not nine months. Well, it was nine or ten months from the original action. There was a little back and forth between plaintiff and defendant in that case. What ultimately the court found in that case was that it wasn't a matter of time. It was a matter of timing. At the time the plaintiff brought the motion, it was at the eve of trial. There was no remedy for the defense. There was very high prejudice for the defense. The court found that it was not an abuse of discretion to not bar the defendant's witness. This was not a motion to compel at that point in Favia. It was a motion to bar. What the court generally said was, well, you kind of sat on your hands until the last second. You don't get that now. We don't have time for anything else. It's time to start trial. There is no other case that touches on this that I'm aware of that anyone else has cited in this case. Thank you. Thank you. Other than barring all discovery on this particular issue of apparent authority, no other aspect of discovery is closed in Plecky v. Methodist at this time. Nothing else. I believe that this is the very definition of arbitrary. The trial court's rulings, I believe, are arbitrary and unreasonable, and as such were an abuse of discretion. What followed was the entry, which followed the same reasoning, was the entry of defendant's motion for protective order using the same legal reasoning. And then what followed after that was a motion for summary judgment brought days after the protective order was entered. In my view, in view of appellate plaintiff, summary judgment for the hospital was essentially predetermined. My prayer for relief in this case is to strike the entry of summary judgment, remand the case back to the trial court for discovery of plaintiff's apparent authority claim. Could you have narrowed your discovery request? We could have. We weren't asked to. Ultimately, there were two issues. I didn't ask you what you were asked to. You were ruled against, and did you ask the judge, can I narrow my request? Yes, we did. We did suggest that if the court wanted some narrowing, we could do so. The court essentially said, well, ultimately, I find that there is, and this was at the end of the motion for the protective order, the court in its ruling stated on the record, I don't believe that there's a way that the plaintiff can fashion any request to allow for any discovery that I feel is relevant. So ultimately, this ruling, and again, the court cited three things, timeliness, undue burden because it needed to be narrowly tailored, and then third, not relevant. The first and second eventually peel away, because after we lost the motion to compel written discovery, we brought oral discovery. And the court said, well, they didn't say it was timely, but they essentially said discovery was still open at that time. But the trial court said, I still don't think it's relevant in any way. And he struck all of it. So no written was allowed, no oral was allowed. And again, I felt it was predetermined once we walked into the summary judgment motion, what was going to happen. Well, counsel, of the facts that you presented, which one of the facts, if you sort of want to bullet point it, did the court not accept in finding that the discovery was not relevant? Because clearly the court considered the allegation of the silent door and some other apparent authority issues, but in the end found that it couldn't narrow the request, nor find further discovery relevant. So what'd you put forward and what is the court not accepted that compelled it to deny it? I can't speak for the trial court. What the trial court said in the hearings was that the trial court felt there was nothing relevant about the requests. We fashioned our requests based on the trial, the case law that we cited in our briefs, and I can touch on. But all of those cases, remember how they answered their discovery. Their answer discovery said, I'll say it specifically, their answer discovery was they object to the request on the grounds that it's overly broad, unduly burnsome and irrelevant as it seeks information not reasonably calculated to lead to admissible evidence. Subject to them without waiving the objection, hospital does not have any marketing or advertising materials related to Dr. Treanor, IGI, or grassroot entomology services. Its answer was not what was asked. There is, I don't know of any in my career that I've seen or seen in any of the case law where there's advertising materials specific to a specific doctor or practice where they relate the doctor and with that hospital. It just doesn't exist. They wouldn't do that. It would seem, based upon what you've just put forward, that the court accepted that there had not been this holding out of the doctor as any type of advertisement. It seems the court almost accepted that in denying further discovery. It seems to have accepted that without any discovery. And frankly, it's that advertising discovery which you see in the motions like Brayboy, Hammer, Spiegelman, Williams, all of those talk generally about, for instance, Brayboy. Well, let's hammer the hammer case. Quote, earned clinical, this is advertising that said, earned clinical leadership in more than 60 fields of medicine and has a team of 1,000 doctors. Spiegelman, their advertisements exalting the care offered the hospital were relevant to holding out despite no evidence a plaintiff ever saw the advertisements. Williams v. Dessier, which is the fifth district case that reversed summary judgment in an apparent authority case. The hospital promoted a, quote, comprehensive array of health care services sufficient to create tribal issue on holding out. None of those cases were specific to a physician or their group. So I would agree the trial court accepted that there's no possible way to ever prove holding out or justifiable reliance. But we didn't have any evidence to discuss on those points other than the very limited testament. We had three different things to talk about. The widow's testimony, Dr. Traynor's testimony, which was very minimal on that point. And then the only thing remaining in the medical records were the consents. So all we had were the consents. And if you want to go down that road, your honor, the consent, when it comes to telling the plaintiff or the patients, it is the hospital's burden to tell them that the doctor is not affiliated in some way or is directly not an employee or not an agent. It is their burden. This is one of the few things that does not fall normally on a plaintiff in a case like this. Well, how did they not fulfill their burden here, counsel? There was this paragraph specifically indicating, I believe, that he was an independent contractor. I know there was another paragraph that was a little more general than that. But how did they not fulfill their burden when it was in black and white? The best they have were two consents, which are, and these are factors by the appellate courts, single-spaced, small font. None of them are bold. None of them are capitalized. And they're buried within long documents. But there were two consents, and they were signed within an hour of each other. I believe they were contradictory, so they were ambiguous and difficult for a lay person to understand. What the first one said was, I acknowledge and understand that most physicians who provide physician services at UnityPoint are not employees or agents. There is no case law that has ever sustained most physicians covers it because that does not specifically name Dr. Traynor or his group in any way whatsoever. The other one, which comes a little bit closer, states that the following are not agents or employees, including but not limited to all physicians and physician assistants staffing the Methodist Emergency Department, radiologists, pathologists, cardiologists, neurologists, surgeons. And this is what they grabbed onto, quote, certain other specialists and physicians. Down below, you have what we consider certain other specialists, since they don't name gastroenterologists, they don't name Dr. Traynor, they don't name IGI. Down below, these independent physicians and physician assistants may be employed by, but not limited to the following medical groups, Peoria Obstetrics, Comprehensive Emergency Solutions, Specialists of Medical Imaging, and Peoria Tazewell Pathology Group. Again, IGI, Dr. Traynor, not specifically named. There was a intimation by, I think, the Appellee in one of the briefs or during arguments. No, in fact, it was a trial judge who said that because Ms. Plekey had some nursing background, she shouldn't know. And in all seriousness, it does not work that way. She wasn't questioned on it, first of all. Second of all, there are no legal background, there's no legal training in nursing school. So how the legal process sets up whether or not a doctor is affiliated with a hospital and in what way, I don't believe there's any training that a nurse goes through to learn about that, nor was she, again, but nor was she questioned. There's no evidence on that one way or the other. So I don't believe that that's pure speculation and could not be, should not be assumed. Well, let me ask you, you suggested that it was disclosed that no patient should assume that whatever doctor they're working with is a patient, is a employee of the hospital. I know that, you know, small print, big document, but what's the standard? I mean, look, don't rely on, some of these people are maybe employees of the hospital, but many are not. That's not why you're letting them operate on you. What are you supposed to do? Well, specifically, What do they have to do as a parent authority anyway? Well, consents tend to go towards the holding out proposition, which is one of the two propositions, the two elements of parent authority. There's holding out and there's justifiable reliance. Consents are generally discussed during the holding out prong. Several cases have made a point that these are legal documents. They have legal, legal ease. Most people don't understand them. There is no reason if they wanted to make it crystal clear, and there are medical records that show that this can be done. Why not just have a consent form with the line that they fill in just before they sign it that says, Dr. Traynor and IGI, and then it has the rest of the verbiage, but they don't. In this case, they go with the legal ease, and frankly, they're not to be expected to understand what it is, especially considering they do it within moments of being wheeled in and put under anesthesia. So, counsel, also with regard to the holding out prong, was plaintiff actually seeking his care from the hospital here, or rather, was it that the hospital was the place that his doctor wanted to provide medical care? It was the latter, was it not? No, it was not. As a matter of fact, there's two points on that. Number one, what we have on that is the testimony of the widow. Mrs. Blecky stated very clearly, they always get their care from Methodists. They would always want it from Methodists. Their treating physician was a Methodist doctor. They believed Dr. Traynor was a Methodist doctor. That was confirmed, they felt, when they were across the street from the hospital in what they believed was a Methodist building. So, what's interesting about the whole in the case, as far as the testimony, is Dr. Traynor was asked about that. And he said, normally, I always do these procedures in my own office. We have the ability to do that. I'm not sure why we didn't do that here. The testimony from Mrs. Blecky is that we would only do this at Methodist. So, if there was a question, I think it can be presumed that Mrs. Blecky said, no, we want this at Methodist. We believe in Methodists. They take care of us. We want our care. That's not like, I think it's the Williams case, where the hospital was actually sought out, was vetted, so to speak. That was even some of the language in that case. The woman was pregnant and made sure that she had actually researched the hospital. I don't believe we have, and I haven't combed every inch of this record, but that is similar here. I mean, that's a different situation than we have here, is it not? In Williams, it was indeed a labor and delivery situation. In that case, there were 13 different consents that the patient signed at the doctor's office, 13 different ones. And despite all of those, the Fifth District Appellate Court overturned an entry of summary judgment on the apparent authority claim and sent it back to the trial court to be tried. Well, let me break in here because there was, in Williams, there was, the plaintiff had done some research on the internet and the doctor's name was associated with this hospital. Their signage contained the doctor's name. We don't have that here. The argument is, you know, your client linked the two buildings. It's almost as if you're trying to, what's the right term to use? Your client's claim of apparent authority comes from maybe seeing a sign on the wall, but you looked at the court in evaluating the relevancy of the discovery request. It's got the testimony of the doctor, the consents. Really, your best evidence is the widow's testimony. Because we are so limited in our discovery, yes, the best we have is the widow's testimony and the consent forms. But again, some of those go to justifiable reliance and some of them go to holding out. And that's parsed out through the case law that was cited. But in an overly broad or a very broad request, doesn't the trial court have to have some substantial, some verifiable information that this is a relevant request? If you follow me, I mean, it's inputting reliance of apparent authority on the hospital based upon this factor that the plaintiff thought the two were related and says there was a name on a door. I concede that what the widow testified to is what she testified to, and there's not a lot outside of that. However, to jump from the idea that the widow's testimony is limited and because it's limited, there is no case ever that should allow any of this discovery. And in effect, we can say that the widow's testimony can move for summary judgment right now on it. There is no case that suggests that. And frankly, it feels unfair for the plaintiff to not be able to explore, at least explore. I'm not saying that- Counsel, I've been in your shoes. I was a criminal defense attorney. I'm very sensitive to what you're arguing right here. I'm struggling, and I guess I'll ask you to comment on the judge's position in ruling upon this motion to compel and discovery request. The judge is in a position where the request potentially is overly broad, and there's very little information to suggest that there's this agency relationship. So if you could answer that way, it will give you some more time because I've asked these questions. But you put yourself in the judge's shoes for just a moment in trying to make this ruling. Well, so then let's get back to the motion to compel, which is where this started because there's no way we should be jumping to summary judgment at that moment, which is kind of what I feel happened. But going back to the relevant aspect, what's relevant about the requests for discovery is that they specifically go to what's been learned in similar cases that were then appealed. And they asked for the kinds of documents that were needed in order to fully explore apparent authority. So if we get rid of timeliness and we get rid of overly burdensome, and we suggest the plaintiff might be able to narrow their request if asked, what I would say is that under Supreme Court Rule 201 in Brown, which we cited, the bar for relevance at the discovery stage is minimal. The material asked for does not need to be admissible in and of itself. It suffices as long it is reasonably likely to lead to relevant evidence. In that case, all such discovery should be allowed. That's a citation to Brown and also a sub citation to Illinois Supreme Court Discovery Rule 201, which is the most basic element of discovery at its onset. I would concede. I don't know if when we get to the end, if we have all of this, if plaintiff is going to prevail on a motion for summary judgment again, but I don't think the trial court could get to that point just yet. I think it needs to be explored. I think it needs to be discovered, send it back, and then summary judgment, I'm sure will be brought again by the hospital. We can decide more so on the merits than we've had in this case. The way it happened here, I believe was arbitrary and unreasonable, and I believe it was an abuse of discretion. Any further questions? Okay. Thank you, Your Honors. Thank you, Counsel. Mr. Drinkwine. Thank you, Your Honor. I may please the court. Good afternoon, Counsel Chris Drinkwine on behalf of Methodist Medical Center of Illinois. There are two questions before this court regarding the substantive issue that's raised, and that is whether there's sufficient evidence that Dr. Treanor was held out as a Methodist employee, and is there sufficient evidence that the Plekis justifiably relied on the holding out? The answer to both questions is no. I would like to address the justifiable reliance first because it's most important. It's Methodist position that our Supreme Court's opinion in Yarborough v. Northwestern Memorial Hospital is dispositive of the justifiable reliance element in this case. Methodist reads Yarborough to hold where the plaintiff chooses the negligent doctor who is in fact not an agent of the hospital, but rather an employee of an independently owned and operated entity. It does not matter if the plaintiff believes that the doctor is the hospital's employee or agent based on evidence that the doctor was held out as its apparent agent. In Yarborough, the plaintiff sought prenatal care at a clinic and ultimately sued clinic doctors for medical negligence. The plaintiff held the subjective belief that the clinic was one in the same with Northwestern Hospital, and her belief was based on a clinic staff member telling her that she would have ultrasounds at Northwestern Hospital, would deliver her baby at Northwestern Hospital, and the clinic providing her with brochures on Northwestern Hospital's birthing center and birthing classes. And despite the plaintiff's subjective belief that the clinic and Northwestern Hospital were one in the same based on this holding out evidence, our Supreme Court refused to read Gilbert as broadly as to impose vicarious liability on Northwestern Hospital under apparent authority for care given by employees of an unrelated, independently owned and operated clinic. The same is true in this case. Despite any evidence that Dr. Treanor was held out as Methodist employee, he is in fact not a Methodist employee. He is an employee of Illinois Gastroenterology Institute or IGI, an independently owned and operated entity. And like the plaintiff in Yarborough, the Plekis sought treatment from Dr. Treanor at IGI, not from Methodist. And now they seek to impose liability on Methodist. The result in this case should therefore be the same as it was in Yarborough. Methodist reading of Yarborough was entirely consistent with the Gilbert court's explanation of the justifiable reliance element. The Gilbert court stated that the critical distinction is whether the plaintiff is seeking care from the hospital itself or whether the plaintiff is looking to the hospital merely as the place for his or her personal physician to provide medical care. Where a plaintiff seeks care from his own physician and then uses the hospital's facilities, the hospital is not liable under the doctrine of the parent agency. And that's precisely what occurred in this case. The Plekis didn't arrive at Methodist and rely on Methodist to provide them with a gastroenterologist to perform the colonoscopy. They relied on Dr. Treanor to provide those services after they were referred to him by Mr. Plekis primary care provider. That the procedure happened to occur at Methodist hospital is inconsequential. When the patient seeks or selects the doctor rather than the hospital, it doesn't matter whether the negligent care, where the negligent care takes place. Yarborough explained that in paragraph 42 where it makes clear that the Illinois Supreme Court has applied Gilbert both outside and inside the hospital. Good afternoon, Mr. Duinguin. I do have a question along the lines that you were just talking about. So are you saying that the hospital, regarding the hospital, that the discovery request here that was made by the Plekis cannot inform the apparent authority question? You talked about the justifiable reliance first but the answer to that question means that the discovery request here wasn't relevant and couldn't be relevant. That's right, your honor. It's not relevant in a case where the patient selects the doctor and also doesn't meet the doctor at the hospital. The marketing materials are what was sought and those only inform the issue if the hospital supplies the doctor not where the patient selects his own doctor. So it was not relevant. And in those two things work hand in glove with the caveat, and it's important to remember that we're talking about a manifest abuse of discretion standard when we're talking about the denial of the motion to compel. But yes, the marketing materials are irrelevant and the trial court was entirely correct in concluding that. But what about, so let's go back to the other aspect of this apparent authority that was brought up by opposing counsel. And that has to do with the two different consents and the language being buried and very confusing. I mean, isn't the patient entitled to have clear language that's understandable, especially under the circumstances of the stress and anxiety of being prepared for surgery and going into surgery or a procedure? Yes, your honor. Of course the consent would eliminate both the apparent authority and the justifiable reliance because if there's adequate disclosure of the independent contractor status of the negligent doctor, then you knew or should have known that he was not the apparent agent and you cannot justifiably rely on any other evidence that would indicate that he was an apparent agent. And as far as the clarity goes, your honor, Methodist relies in Maine on the second disclosure form, which is the common law record 752 and the paragraph at the end there, which would be directly above the signature line on the second page. And we're not grabbing onto the specialist language. We don't need to. This is an all physician situation. It says the physicians providing care and granted it doesn't say all, but physicians providing care means the same thing as all physicians. And the fact that it qualifies that with a bunch of explanations doesn't mean anything. The physicians providing, giving me care, giving care to me, I guess, are not agents or employees of the Methodist Medical Center of Illinois, unless exactly. So the language is clear and unambiguous in the second consent form, which Mr. Plekey signed. And where the language is clear and unambiguous, that provides, as I stated, notice that he's an independent contractor. And then the apparent authority is gone because he knew or should have known he wasn't an agent. And any justifiable reliance is also gone because you can't rely on anything else when you know, or at least constructively know, that he's the independent contractor and not an employee of Methodist. So, Your Honor mentioned the Williams v. Tisier appointment opinion. And in our brief, we distinguished that case based on the fact that the plaintiff mother, expected mother in that case, researched on the internet extensively all about the hospital and so forth. And we don't have that in our case. And we point that out. But the other thing about, plaintiff argues that Williams is on point and that the plaintiff had no preexisting physician patient relationship. The doctor told her that she would deliver her baby at the hospital and the appellate court held that the plaintiff demonstrated genuine issue material fact regarding her reliance and reverse the summary judgment. And that's exactly what happened. But respectfully, Methodist contends that in that regard, Williams is incorrectly decided on the justifiable reliance element because clearly the physician whose conduct was at issue was the plaintiff's chosen obstetrician who had been plaintiff's obstetrician during plaintiff, not just that pregnancy, but a prior pregnancy. And plaintiff only went to the defendant hospital because that is where her obstetrician practiced and did not rely on the hospital to choose or assign the obstetrician for her. Just like the Plekis didn't rely on Methodist to choose Dr. Treanor as their gastroenterologist. So in that respect, Williams stands in contradiction to the decisions of the Illinois Supreme Court in York and Gilbert and decisions of this appellate court in Lamb, Rosenfeld and other cases that all hold that the apparent agency doctrine does not apply where the plaintiff seeks care from a specific physician whose conduct is at issue. So Methodist contends that this case can be decided on the justifiable reliance element alone, but there's also insufficient evidence to establish the holding out element in this case. In order to do that, the plaintiff has to identify record evidence that Methodist or its agent acted in a manner that would lead a reasonable person to conclude that Dr. Treanor was Methodist employee. And as has been alluded to, there's three pieces of the plaintiff's testimony that are relied on here in an attempt to satisfy the holding out element. Now, first plaintiff fails to provide a record citation to her purported testimony that she understood that Dr. Treanor was a Methodist physician because she trusted Methodist Hospital to provide complete care for her husband. So without the record site, that's not an adequate rule 341 and H7 argument and results in waiver. But even putting the waiver aside, there's still no evidence in the record of this purported trust in Methodist Hospital to provide complete care. And even if there was, and this goes back to the relevancy question that your honor asked, evidence that Methodist held itself out as a provider of complete medical care is not relevant where, as in this case, plaintiff sought treatment from his own doctor and not the hospital. And then the doctor merely selected the hospital as the place where the medical care would occur. A hospital marketing itself as a provider of complete care is relevant when the hospital provides the negligent doctor. A hospital marketing itself as a provider of complete care is not pertinent when the patient chose the doctor. So there's- Thank you, Mr. Drinkwine. Does the record really reflect how the procedure got scheduled or the reason the procedure was scheduled at the hospital? I thought we, during the series of questions earlier, that that isn't clear, that Dr. Treanor indicated he usually does it in his office, but he didn't know why specifically it was scheduled at the hospital in this instance. Well, I think that's right, your honor. There's some question about that, but I think ultimately what Dr. Treanor said is, while I normally do these in our, it had a name, like their surgery center or something in the office. He said that this one got scheduled at Methodist where he's also performing these from time to time. And in any event, it's not disputed that it was Dr. Treanor's office that scheduled it there and that the Plekis at least acquiesced in the scheduling of it there. But again, it doesn't matter where the negligent care took place if the doctor is selected by the patient. The court made that clear in the Yarborough case. Was there any staff at the hospital that was involved in any way in his care that was named in the lawsuit? No, I mean, I'm sure there was staff there, but no, they haven't sued. I said that was named in the suit. There wasn't any, there weren't any. There were not any, your honor. That's correct. So the second piece of evidence that plaintiff relies upon in an attempt to satisfy the holding out element is that she believed that Dr. Treanor was a Methodist doctor because her husband's primary care provider, Dr. Morse was a Methodist doctor who always referred them to other Methodist doctors. This is also insufficient to create a genuine issue of material fact on the holding out element because it's not a holding out by a Methodist agent. It's undisputed that Dr. Morse was a UnityPoint clinic physician in Canton, Illinois, where the Plekis lived and not an employee or agent of Methodist, which is a separate entity in Peoria. And plaintiff's mistaken belief that Dr. Morse is a Methodist physician who always referred them to other Methodist physicians is also insufficient to create a genuine issue of material fact on the holding out element because Yarborough teaches us that a subjective belief that entities are affiliated is not enough. And even assuming for the sake of argument that Dr. Morse was an agent of Methodist, which he wasn't, and assuming that he held Dr. Treanor out as a Methodist physician through this practice of always referring the Plekis to other Methodist physicians, even if that were true, the plaintiffs would still have to advance evidence of Methodist knowledge of and acquiescence in that holding out in order to satisfy the second Gilbert element, which is applicable where it's an agent of the hospital doing the holding out. And there's no record evidence that Methodist knew that Dr. Morse was holding Dr. Treanor out as a Methodist physician or that Methodist acquiesced in the holding out. So that leaves the argument that there was a genuine issue of material fact on the holding out element based upon a single visit to Dr. Treanor's office, which plaintiff said that she recollected a little and her testimony that I think I remember a Methodist sign on his office door. I think I remember is the same as testimony indicating I am uncertain, but there may have been a Methodist sign on the door. So plaintiff is speculating and speculation cannot rise, cannot raise a genuine issue of material fact to overcome a motion for summary judgment. In addition, plaintiffs, I think I remember testimony is a mere scintilla of evidence falling short of the quantum of evidence necessary to overcome summary judgment. Methodist cites this court's opinion in Benner v. Bell in support of the proposition that a scintilla of evidence does not create a genuine issue of material fact. And Brenner explains that the quantum- So let me break in. A scintilla of evidence may in fact justify further discovery. You follow me? A scintilla justify further discovery. Yeah, I suppose at the- I suppose that's right. At the time of ruling on the motion to compel, the scintilla wouldn't have been present. Well, that's obviously that's the problem plaintiffs in. They don't know what they don't know. Therefore, there's a need for discovery. If we were- You made a statement earlier that the marketing material is entirely irrelevant and you've done a good job just now arguing that, you know, I think I remember this name on the door, whatever it was with the signage, isn't conclusive enough. But if we accept the executor's testimony that there's a name on a door, doesn't that sort of rise to a level of a scintilla of evidence and raise the question as to whether or not discovery might reveal more information to establish agency? No. First of all, Your Honor, it's not relevant and we maintain that position. But as far as the scintilla thing goes, a scintilla is not enough, says this court in Benner. And if you drill down into that analytically, what the court is saying in Benner is that the quantum of evidence, you know, the volume of evidence in order to raise a genuine initial material fact is measured under the Pedrick standard for directing a verdict. They cite an older case for that proposition, but our Supreme Court reiterated that proposition in Payne v. Whitmer, which is 129 ill second 351, page 358, where the court said, if what is contained in the summary judgment record would constitute all the evidence before a court and would require a court to direct a verdict, summary judgment should be entered. Now, while the directed verdict standard under Pedrick doesn't allow the trial court to weigh evidence or make credibility determinations, and we all understand that, it does permit some disciplined evaluation of the relative strength of the evidence. In fact, our Supreme Court explained in a case styled People v. Rosso-Chocki, which is at 41 ill second 483, page 490, that its decision in Pedrick fully contemplated the trial courts, fully contemplates that trial courts are to decide when weak evidence has so faded in the strong light of all the proof that only one verdict is possible. So at the summary judgment stage, when determining if the quantum of evidence necessary to raise a genuine issue of material fact has been met, this court can evaluate the relative strength of plaintiff's evidence in the context of the study. Can I continue? Please, you can continue and summarize. The point being is the issue would become, would plaintiff self-serving testimony that I think I remember a method of sign on Dr. Treanor's office door be sufficient to survive a motion for directed verdict under proponents of the evidence standard? And Methodist would submit the answer is no in light of the undisputed fact that Dr. Treanor is not an employee of Methodist. IGI is not affiliated with Methodist. And Dr. Treanor's unequivocal testimony that there is nothing on the signage of his door indicating an affiliation with Methodist. And one final point, even if there is a genuine issue of material fact with respect to this sign, I think there was a sign testimony. Again, she would have to demonstrate, plaintiff would have to demonstrate that Methodist acquiesced and approved of his use of the sign in order to meet the second Gilbert element. And there's no evidence that Methodist had knowledge of that sign or acquiesced in its use. And therefore the holding out element is not established even if there is a quantum high enough for that purpose. I see my time is up and Methodist Medical Center respectfully request this court to affirm the judgment of the circuit court. Thank you. Thank you, counsel. Mr. Ports. Thank you, judge. I'll apologize if I jump around, but I will just truly rebut and then sit down. Counsel spent a lot of time on the Yarborough and which they also do in their brief. Distinguishable from Yarborough in the Yarborough case, the plaintiff never set foot inside the defendant hospital. This is completely different. This is a situation where the plucky's have always used Methodist. They don't go to other hospitals. They only want their care at Methodist because they truly believe in Methodist. That falls. Now, I don't want to talk about justifiable reliance and holding out because I think we're putting the cart before the horse. We're talking about something without enough actual discovery. But that being said, we spent a lot of time on justifiable reliance. Her testimony does go directly to justifiable reliance. She relied on Methodist to be there to provide the care for her husband, and it can be expected that he felt the same way. All of their care has been there. The family's care has been there. They understood that's that's where they were going. I think if you flip that around and you go with what a what you could reasonably infer from that testimony. It is I think it's certain that the plucky's would not have gone to Dr. Traynor if the procedure was to be done anywhere other than Methodist. And that, in fact, I think is a reasonable inference from those from her testimony. And if that's the case, then they are, in fact, relying on Methodist. And they always have. Her testimony was clear on that. Um, well, wasn't it clear that she chose the her husband chose the doctor? What was that? That's and we've just talked about a little bit ago that he testified that he usually did the procedures in his office or a surgery center associated in his office or with his office, not the hospital. So I'm not sure I follow what you just said. Counsel, as far as the choice, Mr. Plucky did not choose Dr. Traynor there. In this case, there was a referral, but I mean, certainly you can. Either accept the referral or not accept the referral. I mean, I, I, I would. I would submit that regular folks aren't in a position to suggest otherwise and say the doctor is wrong. We'd like a different doctor. They'd be commenting on the medical state of medical affairs today in our country. But anyway, go ahead. Sure, yeah, I understand. No, but Dr. Morris, who they believed was a Methodist doctor, sent him to Dr. Traynor, whose building was right next to the hospital, and they had the procedure at the hospital. I think she could justify the rely on Methodists to have given the care to their family that they needed. So aren't there aren't there medical practices that have their practice in a hospital or a hospital building? Sure, and my experience is as a trial attorney doing this kind of work my entire career. Some do, some don't. Some have contracts with the hospitals. Some of them just have privileges with the hospital. I'll tell you, when I first filed these lawsuits, I, as the learned lawyer, I don't know what it is until I actually get the contract because they're complicated. Some of these are LLCs. Some of these are S corps. Some of these have privileges where they get a kickback for being on call. It runs the gamut, and there's no way a regular person can know. There's truly no way a regular person can know, and I would consider myself learned on these points. I don't know until I find the contract because there usually is one. I'll leave the court with one final quote that I believe goes to, again, I don't want, I think this is putting the car before the horse, but with regards to evidence that I think that we could glean from discovery that goes to both holding out and justifiable reliance. I take a quote from the Williams case that was quoting the Supreme Court in Gilbert that states hospitals increasingly hold themselves out to the public and expensive advertising campaigns as offering and rendering quality health services. One need only pick up a daily newspaper to see full and half page advertisements extolling the medical virtues of an individual hospital and the quality health care that the hospital is prepared to deliver to deliver in any number of medical areas. Modern hospitals have spent billions of dollars marketing themselves, nurturing the image with the consuming public that they are full care, modern health facilities. All of these expenditures have but one purpose, just to persuade those in need of medical services to obtain those services at a specific hospital. In essence, hospitals have become big businesses competing with each other for health care dollars. In this case, the Plekis believed in that image that Methodist was their care provider, and that's where they intended to have their care. That being said, the industry is as the industry is, and it should be. It's a competitive, very important aspect of our society. I believe the case should be remanded to the trial court to allow discovery and that the summary judgment holding should be stricken. I appreciate the court's time. Thank you, counsel. This matter will be taken under advisement and we will stand in recess at this time.